# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK LEE STINSON, | CASE NO. 1:00-CV-6067-OWW-DLB-P |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE DENIED |
| v. | |
| G. GALAZA, et al., | (Doc. 122) |
| Defendants. | |

I.  Defendants' Motion for Summary Judgment

    A.  Procedural History

Plaintiff Mark Stinson ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on plaintiff's amended complaint, filed April 2, 2001, against defendants Roper, Ortiz, Cooke and Goff ("defendants") for acting with deliberate indifference to plaintiff's serious medical needs, in violation of the Eighth Amendment.[1]  On May 16, 2005, defendants filed a motion for summary judgment. Plaintiff filed an opposition on June 3, 2005 and defendants filed a reply on August 11, 2005. Plaintiff filed a "rebuttal" on September 7, 2005.

///

---

[1] Plaintiff's amended complaint originally included claims for retaliation and declaratory judgment as well as deliberate indifference to medical needs. On April 3, 2002, the Court granted defendants' motion to dismiss and motion for summary judgment as to all defendants and all claims. Plaintiff appealed and in an unpublished opinion filed August 21, 2003, the Ninth Circuit affirmed summary judgment as to plaintiff's retaliation and declaratory judgment claims and remanded plaintiff's deliberate indifference to medical needs claim.

B.     Legal Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©.  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56©, is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

///

1  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436
2  (9th Cir. 1987).

3       In the endeavor to establish the existence of a factual dispute, the opposing party need not
4  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual
5  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
6  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce
7  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
8  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963
9  amendments).

10       In resolving the summary judgment motion, the court examines the pleadings, depositions,
11  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56©.
12  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable
13  inferences that may be drawn from the facts placed before the court must be drawn in favor of the
14  opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655
15  (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing
16  party's obligation to produce a factual predicate from which the inference may be drawn.  Richards
17  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th
18  Cir. 1987).

19       Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show
20  that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole
21  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for
22  trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

23      C.    Discussion
24          1.    Plaintiff's Allegations

25       In his amended complaint, plaintiff alleges that he is HIV-positive and that in March 1999,
26  defendants refused to honor a medical chrono allowing plaintiff to receive ice for migraine
27  headaches and side effects caused by his medication.  As a result, plaintiff alleges that he suffered
28  dehydration, increased severity of his migraine headaches, and an overall worsening of his condition.

2.     Undisputed Facts

1. At all times relevant to the event described in the Complaint, Plaintiff Stinson was a state prisoner housed at Corcoran. Amended Complaint at p.1.
2. Plaintiff is HIV positive. Amended Complaint at p. 2.
3. Plaintiff had a chrono dated January 30, 1998 to January 30, 1999 which authorized him to receive ice for his migraine headaches. Amended Complaint, Ex. 1.
4. Plaintiff had an additional chrono for ice that was dated November 19, 1998 to November 19, 1999. This chrono did not include a medical condition which warranted the need for ice. *Id*.
5. At all times relevant to the events described in the Amended Complaint, defendant Cooke was employed at Corcoran as Facility Sergeant. Declaration of B. Cooke, ¶¶ 1-2.
6. Defendant Cooke recalls giving plaintiff ice as allowed in his chrono. *Id.* at ¶ 4.
7. Sometimes inmates at Corcoran use ice in their possession to hustle the other prisoners. For example, they have been known to sell their ice to other prisoners. *Id*. at ¶ 5.
8. Plaintiff was upset with the amount of ice defendant Cooke gave him, and filed a CDC inmate appeal. *Id*. at ¶ 6.
9. The chrono, dated January 30, 1998 to January 30, 1999, authorized ice for plaintiff for medically related purposes. Defendant Cooke was aware that certain medications increased the body temperature and caused dry mouth. He did not know specific facts regarding plaintiff's medical condition. *Id* at ¶ 7.
10. During the period of time relevant to plaintiff's claims, there were concerns at Corcoran regarding the authenticity of chronos. There was an abundance of chronos during this time and some physicians found that their signatures were forged on the chronos. It was determined that inmates working in the medical unit probably obtained blank chronos and falsified the doctors' signatures. *Id*. at ¶ 8.
11. At all times relevant to the events described in the Amended Complaint, defendant Roper was employed at Corcoran as an Officer. Declaration of R. Roper.

12. Defendant Roper recalls giving plaintiff ice or ice water as needed. *Id.* at ¶ 4.

13. Although defendant Roper knew plaintiff was HIV positive, he did not know what specific medical treatment plaintiff was receiving. *Id*. at ¶ 8.

14. At all times relevant to the events described in the Amended Complaint, defendant Ortiz was employed at Corcoran as a Facility Captain. In his position as Facility Captain, Ortiz oversaw classification and custody operations at Corcoran. He also reviewed and assigned CDC 602 inmate appeals. Declaration of D. Ortiz, ¶ 1-2.

15. At all times relevant to the events described in the Amended Complaint, defendant Goff was employed at Corcoran as a Correctional Officer. Plaintiff's Deposition, Declaration of Counsel, Exhibit A ("Plaintiff's Deposition"), at p. 35.

16. In 1999, at the time of the events alleged in the Amended Complaint, inmates could get cold water at water fountains located on the yard and in the housing units. Cold water was also available in sinks located in the cells. *Id.* at p. 32.

17. Dr. Mission (non-defendant) is a physician employed by the CDC at the California Men's Colony (CMC). Declaration of Dr. Mission, filed September 27, 2001 in support of defendants' motion to dismiss.

18. Dr. Mission has examined plaintiff on several occasions at CMC. *Id*. at ¶ 7. Acquired immunodeficiency syndrome or AIDS is an advanced HIV related condition and can cause opportunistic infections, malignancies, neurologic dysfunction and a variety of other syndromes. *Id*.

19. There are laboratory values which characterize a patient who is HIV positive. Generally, depending on the duration of illness, these patients will have detectable levels of HIV RNA plasma. They also may have low CD4 count, measure of helper T cells which are crucial to fighting off infection. *Id.* at ¶ 9.

20. Drug therapy is usually instituted for HIV when the CD4 level reaches below 300. Combinations of drugs commonly used. With consistent compliance to the drug regimen, HIV RNA, or viral load decreases, and the CD4 level increases. *Id*. at ¶ 10.

21. If a patient does not take such medication consistently, the HIV virus can replicate in the

|   |   |   |
|---|---|---|
| 1 | | presence of medication and develop mutations; this causes the medication to lose its |
| 2 | | effectiveness. Typically this loss of effectiveness is detected by increasing plasma HIV RNA |
| 3 | | levels. *Id.* at ¶ 11. |
| 4 | 22. | During the course of Dr. Mission's examination and treatment of plaintiff, there were ongoing issues related to plaintiff's non-adherence to the HIV drug regimen. For example, there were instances when plaintiff did not pick up his medication. *Id.* at ¶ 12. Also, plaintiff further impaired his health by smoking during the time of the events alleged in the Amended Complaint. Plaintiff's Deposition at 19:8-20. |
| 9 | 23. | Dr. Gordon is an independent medical expert who specializes in infectious diseases, and has reviewed and is familiar with plaintiff's medical records. Decl. IME at ¶¶ 1-6. She is currently a partner of the Infectious Diseases Associate Medica Group, in San Francisco, California. Dec. IME at ¶ 2. She is also appointed as an Assistant Clinical Professor of Medicine at the University of California, San Francisco with active teaching responsibilities at the California Pacific Medical Center in San Francisco, California. *Id*. Dr. Gordon also carries active medical staff privileges at the Department of Medicine at the California Pacific Medical Center in San Francisco, California. *Id*. |
| 17 | 24. | Plaintiff's medical records document at least seven visits to a physician in early 1999. Plaintiff's medical records document his complaint about the lack of ice. Decl. IME at ¶ 7. |
| 19 | 25. | In May 1999, the physician notes that plaintiff reports that he is taking his HIV anti-viral medications (which consisted of Zerit, Epivir and Nevirapine) only at night because tap water is not potable for him. The treating physican, because of this non-compliance, discontinued all his treatment until plaintiff agreed to take the medications properly, on a twice a day schedule. Dr. Gordon agrees with this action because it was done to prevent the development of resistance to anti-viral medication. Decl. IME at ¶ 8. |
| 25 | 26. | At some point in July 1999, plaintiff was restarted on the HIV anti-viral medications, Zerit, Epivir and Efavirenz and plaintiff made a request for ice water because of, "a warm sensation all over for one year." The physician also noted that around this time plaintiff appears not to be compliant with the HIV medication. Decl. IME ¶ 9. |

27. In November 1999, plaintiff requested another physcan because the treating physician at that time would not prescribe him ice water. Again, the physician noted that plaintiff stopped taking his medications because of a burning sensation. Around this time, plaintiff started treatment with Dr. Mission, with whom, from what the records reflect, plaintiff appeared to have some rapport. Dr. Mission's notes regularly document plaintiff's continued failure to comply with his medications. Decl. IME at ¶ 10.

28. On July 6, 2000, Dr. Mission notes that plaintiff reports he has had migraines since 1993 or 1994. In December 2000, Dr. Mission noted that plaintiff skips his medications once a day. The notes read, "there seems to be no way to get him to agree to do better." Decl. IME at ¶ 11.

29. In February 2001, plaintiff admits to taking medications at most once daily. Again, Dr. Mission notes concern about plaintiff's lack of compliance with his medications. Decl. IME at ¶ 12.

30. Even with plaintiff's non-compliance, plaintiff's HIV infection holds stable until early 2002, much past the time when he alleges he was denied ice water. Decl. IME ¶ 13.

31. As of the time plaintiff was deposed on December 6, 2004, he was not taking any medication for his HIV conditions. Decl. Of Counsel, Ex. A, at 34, ll. 9-11.

32. After reviewing plaintiff's medical records, it is Dr. Gordon's conclusion that a high degree of non-compliance with HIV medications is the reason that plaintiff's HIV is now difficult to control. Continued non-compliance with medications leads to the accumulation of resistance of antiviral medication and subsequent decline in T-cells. The accumulation of resistance of antiviral medication renders the medication ineffective over time and causes the ultimate failure of treatment. Decl. IME ¶ 14.

33. It is Dr. Gordon's opinion that in no way did the denial of ice water during a brief period in 1999 contribute to the failure of plaintiff's antiviral therapy and the worsening of plaintiff's condition. Decl. IME ¶ 15.

       3.     <u>Plaintiff's Eighth Amendment Claims</u>

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). A prisoner's claim of inadequate medical care does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)). A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment," or in the manner "in which prison physicians provide medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Where a prisoner is alleging a delay in receiving medical treatment, as plaintiff is here, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

Defendants argue that plaintiff has failed to show deliberate indifference to a serious medical need. Assuming arguendo that defendants ignored physicians' orders prescribing plaintiff ice and therefore plaintiff was denied ice, defendants contend plaintiff has failed to show how this alleged denial caused him further injury. Defendants argue that plaintiff has failed to establish how being denied ice on one occasion several years ago at Corcoran worsened his HIV condition. Defendants submit the Declaration of an independent medical expert, Dr. Gordon, who opines that plaintiff's high degree of non-compliance with HIV medications is the reason that plaintiff's HIV is now difficult to control. Undisputed Fact. No. 32. Dr. Gordon opines that in no way did the denial of ice water during a brief period in 1999 contribute to the failure of plaintiff's antiviral therapy and the worsening of plaintiff's HIV condition. Undisputed Fact No. 33. Defendants argue that since there is no material issue of fact regarding the causal relationship between the alleged denial of ice and the worsening of plaintiff's HIV condition, plaintiff has failed to establish a serious medical need and that defendants were deliberately indifferent to that need.

1   Defendants made the same argument in their prior motion for summary judgment. The Ninth
2   Circuit disagreed found that a genuine issue of material fact existed regarding whether the denial of
3   ice to plaintiff demonstrated "deliberate indifference to a serious medical need." In doing so, the
4   Court pointed out that there was evidence in the record that plaintiff was injured by the refusal to
5   give him ice, namely, that plaintiff suffered severe dehydration, unrelenting pounding in his head
6   brought on by migraine headaches and a burning sensation in his throat, chest and stomach. While
7   defendants argue these symptoms were not caused by the denial of ice but were side effects of
8   plaintiff's medication, the side effects from the medication appear to be the very reason the ice was
9   ordered by plaintiff's doctor. Defendants have presented no new evidence on this issue in the present
10  motion. The only new evidence offered is the declaration of an independent medical expert who
11  does not render an opinion regarding the side effects of plaintiff's medication. Dr. Gordon opines
12  that non-compliance with medication is the reason that plaintiff's HIV is now difficult to control.
13  However, the injury identified by the Ninth Circuit was not the worsening of plaintiff's HIV
14  condition, but rather the severe side effects caused by the medication for which the ice was ordered
15  to alleviate. Because the Court has the same record before it on the material issues, there remains
16  a genuine issue of material fact as to whether defendants were deliberately indifferent to plaintiff's
17  serious medical needs by denying him ice which was arguably ordered to combat painful side effects
18  from plaintiff's HIV medication.

19      4.    <u>Qualified Immunity</u>

20  Defendants also argue they are entitled to qualified immunity, first because plaintiff has
21  failed to establish the violation of a constitutional right and second because it would not have been
22  clear to a reasonable official that the conduct at issue was unlawful. The Ninth Circuit also rejected
23  this argument and defendants have offered no new evidence which would allow this Court to deviate
24  from that decision.

25  Government officials enjoy qualified immunity from civil damages unless their conduct
26  violates "clearly established statutory or constitutional rights of which a reasonable person would
27  have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In ruling upon the issue of qualified
28  immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the

9

1  injury, the facts alleged show the defendant's conduct violated a constitutional right.  Saucier v.
2  Katz, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next step is to ask
3  whether the right was clearly established.  Id.  The inquiry "must be undertaken in light of the
4  specific context of the case, not as a broad general proposition . . . ."  Saucier v. Katz, 533 U.S. 194,
5  201 (2002).  "[T]he right the official is alleged to have violated must have been 'clearly established'
6  in a more particularized, and hence more relevant, sense:  The contours of the right must be
7  sufficiently clear that a reasonable official would understand that what he is doing violates that
8  right."  Saucier, 533 U.S. at 202 (citation omitted).

9        The court must view the evidence in the light most favorable to plaintiff and resolve all
10 material factual disputes in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir.
11 2003).  As previously discussed, plaintiff alleges that defendants refused to give him ice that was
12 prescribed by his doctor and that he suffered severe dehydration, migraine headaches and a burning
13 sensation in his throat, chest and stomach.  These allegations are sufficient to show that defendant's
14 conduct violated a constitutional right.  Accordingly, the first prong of the qualified immunity
15 inquiry set forth in Saucier has been met.  Saucier, 533 U.S. at 201.

16       The second inquiry is whether the contours of plaintiff's right under the Eighth Amendment
17 were sufficiently clear that a reasonable officer would have understood that the denial of ice to
18 plaintiff violated that right.  Saucier, 533 U.S. at 202 (citation omitted).  Prison officials are
19 deliberately indifferent to a prisoner's serious medical needs when they "deny, delay or intentionally
20 interfere with medical treatment" for a serious medical need.  McGuckin v. Smith, 974 F.2d 1050,
21 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136
22 (9th Cir. 1997) (en banc).  Accordingly, a reasonable officer would have understood that denying
23 ice to plaintiff which was prescribed to alleviate painful side effects from his medication would
24 violate the Eighth Amendment.  Defendants argue that at the time plaintiff was allegedly denied ice
25 (March 1999), his chrono for ice had expired and the Chief Medical Officer had rescinded all ice
26 orders.  *See* Declaration of R. Roper at Docket No. 43, ¶ 5.  However, plaintiff disputes this and
27 points out that defendants have failed to produce the memorandum to which they refer.  *See*
28 Opposition to Motion for Summary Judgment at1:22-26.  Moreover, plaintiff attaches to his

amended complaint a chrono which authorized him to receive ice from November 19, 1998 through November 19, 1999. Amended Complaint, Exhibit "A."

As stated by the Ninth Circuit, "[t]he law concerning deliberate indifference was clearly defined at the time defendants refused the prescribed ice and a reasonable official would have understood that the alleged actions were contrary to law." This Court also finds that defendants are not entitled to qualified immunity on plaintiff's claims against them.

II.   Conclusion

In conclusion, the Court finds that defendants have not met their burden as the parties moving for summary judgment, as defendants have not submitted evidence sufficient to establish that there exist no genuine issues of material fact with respect to plaintiff's claim that defendants acted with deliberate indifference to his serious medical needs.

Based on the foregoing, it is HEREBY RECOMMENDED that defendants' motion for summary judgment, be DENIED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **twenty (20) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **January 29, 2006**              /s/ Dennis L. Beck
3b142a                                UNITED STATES MAGISTRATE JUDGE